IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CARDX, LLC,

          Plaintiff,

v.                                  Case No. 20-2274-JWB

DEREK SCHMIDT, *in his official capacity*
*as Kansas Attorney General,*

          Defendant.

**MEMORANDUM AND ORDER**

This case is before the court on the parties' cross-motions for summary judgment.  (Docs. 15, 17.)  The issues raised in the motion have been fully briefed.  (Docs. 16, 17, 18.)  On February 2, 2021, the court held a telephonic hearing at which it raised a question concerning Plaintiff's standing to asserts its claims.  The parties have now filed supplemental briefs addressing the standing issue (Docs. 22, 23), making the motion ripe for decision. For the reasons stated herein, Plaintiff's motion for summary judgment and Defendant's motion for summary judgment are each GRANTED IN PART and DENIED IN PART.

## I.  Background

Plaintiff is a technology company with software that allows merchants to display prices, including cost surcharges on purchases made by credit card, and thereby allows consumers to comparison shop among payment types.  Plaintiff filed this action challenging K.S.A. 16a-2-403, a Kansas law that prohibits sellers from imposing a "surcharge" at the time of sale on consumers who pay by credit card rather than by cash.  Although this provision prohibits a surcharge, it permits sellers to offer a discount to consumers who pay by cash.  As a result, the law effectively

limits what Plaintiff (and merchants) can treat as the "regular price" of an item and the corresponding information about prices and credit card fees that can be conveyed to consumers. Plaintiff argues the Kansas law is an unconstitutional restriction on commercial speech in violation of its First Amendment rights. It also argues the law is unconstitutionally vague and violates Plaintiff's right to due process of law. Plaintiff seeks relief under 42 U.S.C. § 1983 in the form of a declaration that K.S.A. 16a-2-403 is unconstitutional as applied to Plaintiff. (Doc. 1 at 16.)

## II.  Uncontroverted Facts

The following facts are uncontroverted for purposes of summary judgment. (Doc. 17 at 1.)

K.S.A. 16a-2-403 (the "Kansas no-surcharge statute") states as follows:

No seller or lessor in any sales or lease transaction or any credit or debit card issuer may impose a surcharge on a card holder who elects to use a credit or debit card in lieu of payment by cash, check or similar means. A surcharge is any additional amount imposed at the time of the sales or lease transaction by the merchant, seller or lessor that increases the charge to the buyer or lessee for the privilege of using a credit or debit card.

The Kansas no-surcharge statute allows cash "discounts" but prohibits credit card "surcharges." *See* The Hon. Ken Francisco, Kan. Att'y Gen. Op. No. 86-115 (1986).

The no-surcharge statute provides exemptions for educational boards and institutions, and state and county entities. *See e.g.*, K.S.A. 72-1176; 19-122; 75-30.100.

Violators of the statute are subject to, among other things, administrative investigations, cease and desist orders, administrative fines, civil liability for consumer restitution, and civil penalties. Defendant Derek Schmidt is the Kansas Attorney General and has the authority in his official capacity to enforce the Kansas no-surcharge statute. (Doc. 16 at 10.) He has recently enforced the no-surcharge statute. (*Id*.)

On credit card transactions, merchants are typically charged interchange fees of two to three percent of the purchase price for goods and services, and those fees are increasing. A study

by the U.S. Government Accountability Office determined that between 2005 and 2009, interchange fees charged for certain premium rewards credit cards rose by 24%. Consumers now use rewards credit cards, which are more expensive to accept than standard credit cards, for more than 80% of their credit card purchases. These rising fees disproportionately affect small businesses, as large retailers are able to negotiate discounted fee arrangements with credit card companies due to their large transaction volumes. (*Id.* at 10-11.)

Visa reportedly will implement fee structure changes in 2021 that will increase fees for certain transactions, including purchases on e-commerce sites or other "card-not-present" transactions. (*Id.* at 11.)

In Kansas, merchants remain obligated to absorb the costs of a consumer's choice to use a credit card because the no-surcharge statute makes it illegal to communicate differential pricing as a surcharge. When businesses are unable to pass on the cost of a credit card acceptance as a surcharge, that cost is often built into the costs of all goods and services sold by that business, which in turn raises prices for all customers regardless of whether they use credit or non-credit payment options. This results in a "cross-subsidy" from non-credit payers to the customers who pay by credit card. For the average credit card user, this amounts to over $1,100 per year. (*Id.* at 12.)

Credit card surcharges allow businesses to allocate the costs of credit card acceptance to only those customers who choose to use credit cards. Expressing price differential as a cash "discount," as permitted by the Kansas no-surcharge statute, is inaccurate and disadvantages both businesses and consumers. Describing a price differential as a cash "discount" necessitates higher advertised prices to customers than the actual base price of a good or service, which may competitively disadvantage that business. Businesses often find it difficult to explain the

difference between a "surcharge" and a "discount" to employees or representatives, and consequently worry that an employee or representative will inadvertently violate a no-surcharge law by incorrectly describing a price differential.  Business owners are placed in limbo, not knowing whether they will incur legal liability for conveying truthful information to customers. (*Id.*)

No-surcharge statutes prevent businesses from communicating price differentials to their customers as transparently as possible – i.e., informing them that paying by credit card creates a cost and, if they elect to use a credit card, they will bear this cost in the form of an additional fee. Confusing representations of price differentials can cause distrust or lead to a negative customer experience.  (*Id.*)

Allowing credit card surcharges benefits businesses and consumers.  Some businesses – particularly in industries such as wholesale distribution, construction, and professional services – operate on profit margins so narrow that they are unable to accept payment via credit card unless they are permitted to pass on the cost of credit card acceptance to cardholders.  (*Id*. at 13.) If allowed to pass on the cost of credit card acceptance, such businesses are able to offer their goods and services to the significant portion of the consumer base that prefers or needs to pay with credit. In these industries and across the economy, credit card surcharges expand consumer choice. Simply choosing not to accept credit cards is not a viable option for most businesses, because most consumers prefer to pay with credit or debit cards.  Some businesses are also wary of advertising a cash discount or encouraging consumers to pay with cash due to stigmas associating cash transactions with tax avoidance.  (*Id.*)

Following the onset of the coronavirus pandemic, the pressure on merchants to accept credit card payments has become even greater as consumers are increasingly reluctant to use cash;

they seek contact-free and online payment options instead.  At the same time, merchants that are struggling to remain economically viable are pursuing all available options to reduce expenses, including their credit card costs.  (*Id.*)

Plaintiff is a financial technology company headquartered in Illinois and incorporated in Delaware.  Plaintiff was founded in 2013 on the heels of the settlement reached in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D. N.Y. 2013), *rev'd and vacated,* 827 F.3d 223 (2d Cir. 2016), which resulted in major credit card companies changing their rules to allow merchants to apply credit card surcharges.  (Doc. 16 at 13-14.)  These new rules enabled businesses in the United States to pass on the transaction fee when customers choose credit cards (often for their convenience or rewards).  The new rules imposed numerous contractual requirements on businesses that seek to surcharge.  These requirements mandate that, in order to impose a surcharge, merchants must:

    a. Be registered with Visa and Mastercard prior to surcharging;
    b.  Make disclosures to customers, including the surcharge amount;
    c.  Apply a surcharge no greater than:
        (i) what the merchant pays to its credit card processing provider (i.e., the merchant must not profit from the surcharge); or
        (ii)  4% of the transaction amount, whichever is less;
    d. Identify debit cards and prepaid cards to ensure they are not surcharged;
    e.  Itemize the surcharge amount on the customer receipt; and
    f.  Refund the surcharge amount if the original transaction is refunded.

(*Id.* at 14.)

Since 2003, Plaintiff has contracted with more than 5,000 merchants, ranging from small businesses to public companies, in the 46 states (and in the District of Columbia) where credit surcharges are currently permitted. (*Id.*)  Plaintiff's patent-pending payment processing software allows merchants to display and process price differentials in compliance with all applicable credit card company requirements.  The standard pricing model of Plaintiff's software displays the price

of the good or service, plus the cost associated with credit card use both as a percentage of the price and in dollars and cents.  This model is used for both online displays and payment terminal signage and screen displays.   The model ensures that the surcharge is always equal to the merchant's actual credit card processing cost, and that no surcharges are applied to debit card purchases.  (*Id.* at 14-15.)

The Kansas no-surcharge statute, as it has been interpreted and enforced by Defendant, prohibits Kansas merchants from communicating price differentials in the manner displayed by Plaintiff's product.  Plaintiff brings this constitutional challenge because Plaintiff is unable to sell its payment software to Kansas businesses.  (*Id.* at 15.)

### III. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc*., 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Id*. The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### IV.  Analysis

### A. Standing

Although the parties did not raise the issue of Plaintiff's standing to assert its claims, and Defendant does not contest it (*see* Doc. 23 at 1), standing is a jurisdictional issue the court is obligated to address.  *PeTA, People for the Ethical Treatment of Animals v. Rasmussen,* 298 F.3d 1198 (10th Cir. 2002).  *See also Frank v. Gaos,* 139 S. Ct. 1041, 1046 (2019) ("We have an obligation to assure ourselves of litigants' standing under Article III."); *Virginia House of Delegates v. Bethune-Hill,* 139 S. Ct. 1945, 1951 (2019) ("As a jurisdictional requirement, standing to litigate cannot be waived or forfeited.")  "Plaintiffs have the burden to demonstrate standing for each form of relief sought." *Lippoldt v. Cole*, 468 F.3d 1204, 1216 (10th Cir. 2006). "The Constitution grants Article III courts the power to decide 'Cases' or 'Controversies.'" *Carney v. Adams,* 141 S. Ct. 493, 498 (2020) (citing U.S. Const., Art. III. § 2).  "The Supreme Court's standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, … and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *The Wilderness Soc'y v. Kane Cty., Utah,* 632 F.3d 1162, 1168 (10th Cir. 2011) (en banc) (citations and internal quotation marks omitted).

To have Article III standing, a plaintiff must show that the conduct of which he complains has caused him to suffer an "injury in fact" that a favorable judgment will redress.  *Id.* (citation omitted).  *See also Aptive Envtl., LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 973 (10th Cir. 2020) (a plaintiff must demonstrate standing by establishing (1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.)  Prudential limitations  – which are "closely related to [Article] III concerns but essentially matters of judicial self-governance" –

include a general prohibition on a litigant raising another person's legal rights.[1]  *The Wilderness Society,* 632 F.3d at 1168 (citing *Warth v. Seldin,* 422 U.S. 490, 499 (1975)).  *See also Warth,* 422 U.S. at 500 ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.")

The court raised standing because of concerns about whether Plaintiff was alleging a violation of its own free speech rights, or whether it was claiming injury from the infringement of free speech rights of others – namely, Kansas merchants to whom Plaintiff wants to sell its products.  Although the complaint alleged that the speech restriction in K.S.A. 16a-2-403 "violates CardX's rights under the First Amendment," it did not really explain how Plaintiff's own right to engage in commercial speech was infringed by a restriction limiting communication of surcharges by merchants.  (Doc. 1 at 15.)  At places the complaint indicated merely that Plaintiff "provides its software to businesses," that the software "allows *merchants* to display" price differentials to customers, and that the Kansas statute prohibits "*merchants* from informing consumers" about credit card surcharges.  (*Id.* at 4-6) (emphasis added).

An initial declaration by Plaintiff's CEO, which was submitted in support of Plaintiff's motion for summary judgment, offered a somewhat cryptic description of how Plaintiff's products work.  (Doc. 16-2.)  Among other things, it asserted that Plaintiff's software allows merchants to

---

[1] The prudential character of the rule against third-party standing may not be fully settled.  *Compare June Med. Svcs. L.L.C. v. Russo,* 140 S. Ct. 2103, 2118 (2020) (Breyer, J.) (plurality opinion) (finding rule against third-party standing was prudential limitation that was waived)  *with id.* at 2144 (Thomas, J. dissenting) (noting Supreme Court case questioning validity of prudential standing doctrine and suggesting the rule against third-party standing might be part of Article III's case or controversy requirement). For the moment at least, the Tenth Circuit continues to hold that "third party standing should continue to be analyzed under the framework of prudential standing."  *Hill v. Warsewa,* 947 F.3d 1305, 1309 (10th Cir. 2020).  There is some conflicting case law on whether a court is obligated to raise prudential standing concerns on its own, but the cases generally agree that a court remains free to raise such limitations sua sponte.  *See In re Stanworth,* 543 B.R. 760, 770 (Bankr. E.D. Va. 2016) (collecting cases).  *Cf.  Hobby Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1162 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682 (2014) (prudential-standing limitations are subject to waiver but the court has discretion to address them sua sponte).

display and process price differentials in compliance with credit card company requirements; and that Plaintiff's "standard pricing model" displays the price of the good or service, plus a cost for use of a credit card, for "online displays," on "payment terminal signage," and on "screen displays." (*Id.* at 3-4.) A second declaration by Plaintiff's CEO, submitted with a supplemental brief on standing, adds some details. (Doc. 22-1.) According to this declaration, the merchant sets the price of a good or service and, during a transaction, "*CardX's software* calculates the appropriate surcharge" based on applicable rules and requirements "and communicates the base cost, surcharge amount, and total cost to the consumer." (*Id.* at 2) (emphasis added). For in-person transactions, the fact of a surcharge "is communicated to the customer on CardX-branded signage" in the merchant's store, and the base costs, surcharge amount, and total cost "is communicated to the customer on the payment terminal that is supplied to the merchant by CardX." (*Id.* at 203.) For online transactions, these details are "communicated to the customer on a user interface designed by CardX, branded with CardX's logo, and licensed to the merchant." (*Id.* at 3.) Furthermore, Plaintiff charges certain fees to its clients, including for use of payment terminals, which the clients may pay by credit card. When they do pay by credit card, Plaintiff adds a surcharge and the "base cost, surcharge amount, and total cost is communicated to the client in the same manner as for other online transactions." (*Id.*) Plaintiff has received inquiries from existing clients who operate nationally about using Plaintiff's products for selling goods or services in Kansas, but Plaintiff informs them the Kansas no-surcharge statute prohibits Plaintiff from operating in Kansas. (*Id.*) Plaintiff's contracts with certain clients require Plaintiff to indemnify the client for losses, including civil liability under state surcharge laws, arising out of their use of Plaintiff's products. (*Id.*) Plaintiff does not do business in Kansas because of the risk of enforcement of the no-surcharge statute against Plaintiff and its clients. (*Id.* at 4.) During the

January 29 hearing, defense counsel agreed with an assertion that K.S.A. 16a-2-403 could be enforced against Plaintiff under an agency theory if Plaintiff assisted a merchant in conveying credit card surcharge information to customers.

Based on the evidence presented, the court concludes Plaintiff has made a sufficient showing that K.S.A. 16a-2-403 has caused it to suffer an injury-in-fact that a favorable judgment will redress. Where (as here), a plaintiff seeks prospective relief based on the chilling effect of a threatened sanction on speech, a plaintiff meets the first element of standing (an injury-in-fact) by showing: (1) evidence that it has previously engaged in the type of speech affected by the government regulation; (2) affidavits or testimony showing a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that it presently has no intention to do so because of a credible threat that the statute will be enforced. *Aptive Envtl., LLC,* 959 F.3d at 974-75 (citing *Initiative & Referendum Inst. v. Walker,* 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc).[2] The declaration of Plaintiff's CEO shows Plaintiff has previously communicated the fact of surcharges to customers in a way that would violate K.S.A. 16a-2-403, that it desires to engage in such communication in Kansas, but that it does not currently intend to do so because of a credible threat of enforcement of the Kansas statute. A threat of sanction is credible in light of evidence that Plaintiff itself acts as a seller of its products and conveys surcharge information to its own clients when they pay by credit card; Plaintiff also acts to convey surcharge information to customers of its client-merchants, either in cooperation with or as an agent of those merchants; Plaintiff is not engaging in business in Kansas because of the risk of enforcement of the no-

---

[2] The Tenth Circuit in *Aptive Envtl. LLC* cited additional case law setting forth variations on this test, including *Holder v. Humanitarian Law Project,* 561 U.S. 1, 15-16 (2010), which it said concluded the plaintiff had standing to bring a pre-enforcement First Amendment challenge to a statute because (1) they had engaged in covered conduct before enactment of the statute, (2) they would engage in this conduct again if the statute's allegedly unconstitutional bar were lifted, (3) the government had enforced the statute against other parties, and (4) the government had not argued that it would not enforce the statute against the plaintiffs. *Aptive Envtl. LLC,* 959 F.3d at 975. Plaintiff's evidence in the instant case is sufficient to show standing under this alternative standard.

surcharge statute; and Defendant's litigation position indicates Defendant would seek to enforce K.S.A. 16a-2-403 against Plaintiff if it assisted or cooperated with merchants in conveying credit card surcharge information to consumers in Kansas.  *See Aptive Envtl. LLC,* 959 F.3d at 976 (noting cases where credible threats found based on government's refusal to disavow enforcement against plaintiff and where plaintiff circumscribed its behavior to avoid sanctions). Plaintiff has thus shown an injury-in-fact.

Plaintiff has also shown the second element of standing: a sufficient causal connection between the injury and the conduct complained of.  *See Aptive Envtl., LLC,* 959 F.3d at 973.  The evidence on summary judgment is uncontroverted that Plaintiff is refraining from doing business in Kansas because of a threat of enforcement of K.S.A. 16a-2-403 by Defendant against Plaintiff. This is sufficient to show a "substantial likelihood" that the Kansas statute is the reason why it has suffered the alleged injury of being unable to convey surcharge pricing information to Kansas customers.  *Cf. Aptive Envtl. LLC*, 959 F.3d at 978 (applying "substantial likelihood" standard for showing of causation).

The third and final element of Article III standing – that the injury would be redressed by a favorable judgment – is also met.  Plaintiff seeks a judgment declaring that K.S.A. 16a-2-403 is unconstitutional as applied to Plaintiff.  (Doc. 1 at 1, 16.)  Such relief would redress Plaintiff's claimed injury of being unable to convey credit card surcharge information to consumers.  *Cf. Aptive Envtl. LLC,* 959 F.3d at 978; *Pacific Frontier v. Pleasant Grove City,* 414 F.3d 1221, 1229 (10th Cir. 2005) ("plaintiff's injury is directly traceable to enforcement of the Ordinance, which would be redressed by a judicial conclusion that the Ordinance is unconstitutional.")  Plaintiff has thus shown standing to assert its claims.

Under the prudential standing doctrine, a party generally may not rest its claims on the rights of third parties where it cannot assert a valid right to relief of its own. *Hill,* 947 F.3d at 1309-10 (citing *The Wilderness Soc'y,* 632 F.3d at 1170). The court's initial concerns about Plaintiff's reliance upon the free speech rights of merchants, rather than its own rights, have been alleviated by the evidence. Plaintiff has cited uncontroverted evidence that, but for the Kansas statute, Plaintiff itself would seek to convey credit card surcharge information to merchants who purchase products or services from Plaintiff by credit card. In light of that evidence, which shows that Plaintiff asserts, at least in part, a violation of its own free speech rights, the court need not delve further into whether Plaintiff's participation or involvement in conveying pricing information to consumers of other merchants constitutes speech by Plaintiff. Plaintiff has shown that it asserts a violation of its own First Amendment rights.

**B. First Amendment Standards.**

Section 1983 provides a remedy for a plaintiff who is deprived of a federal right by a person acting under color of state law.[3]  42 U.S.C. § 1983. Plaintiff alleges that Defendant, under color of Kansas law, is depriving Plaintiff of a First Amendment right to free speech.[4]  The First Amendment, which provides in part that "Congress shall make no law … abridging the freedom of speech," among other things "protects commercial speech from unwarranted governmental regulation." U.S Const. amend. I; *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 561 (1980).

---

[3] The court notes Defendant does not assert Eleventh Amendment immunity, and such immunity is inapplicable given that Defendant is responsible for enforcement of K.S.A. 16a-2-403 and has enforced it in the past, and Plaintiff seeks only prospective equitable relief to prevent enforcement of the allegedly unconstitutional act. *See Ex Parte Young,* 209 U.S. 123 (1908).

[4] The First Amendment applies to the States under the Due Process Clause of the Fourteenth Amendment. *iMatter Utah v. Njord,* 774 F.3d 1258, 1263 (10th Cir. 2014) (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 749 n.1 (1976) and *44 Liquormart, Inc. v. Rhose Island,* 517 U.S. 484, 489 n.1 (1996)).

In *Expressions Hair Design v. Schneiderman,* 137 S. Ct. 1144 (2017), the Supreme Court reviewed a challenge to a New York no-surcharge law similar to the Kansas provision.[5]   Although a lower court held that the provision posed no First Amendment problem because it regulated conduct (prices) rather than speech, the Supreme Court rejected that view.  *Id.* at 1151.  The Court pointed out that the law allowed a seller to charge any amount it wanted for an item sold by credit, but if the seller wanted to charge $10 for a cash item and $10.30 for a credit item, it was "not free to say '$10, with a 3% credit card surcharge,'" but must instead "display $10.30 as his sticker price." *Id.*  "In regulating the communication of prices rather than prices themselves, [the statute] regulates speech." *Id.*  The Supreme Court remanded for the lower court to consider whether the provision was a valid commercial speech regulation under the test established by *Central Hudson*. *Id.*

In *Central Hudson,* the Supreme Court set forth a framework for analyzing claims of improper infringement of commercial speech, which it defined as "expression related solely to the economic interests of the speaker and its audience." *Id.* at 561.  The Court first noted that commercial expression "assists consumers and furthers the societal interest in the fullest possible

---

[5] The Supreme Court explained the history of these provisions.  When credit cards were first introduced, contracts between card issuers and merchants barred merchants from charging credit card users higher prices than cash customers.  *Expressions Hair Design,* 137 S. Ct. at 1147.  Congress put a partial stop to this in 1974 amendments to the Truth In Lending Act (TILA), by barring card issuers from contractually prohibiting merchants from giving discounts to customers who paid in cash.  *Id.*  Two years later, Congress amended TILA to bar merchants from imposing surcharges on customers who used credit cards.  A "discount" (which was permissible) was defined as "a reduction made from the regular price," while a "surcharge" (which was prohibited) was defined as "any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash, check, or similar means." *Id.* In 1981, Congress further delineated the distinction between discounts and surcharges by defining "regular price."  Where a merchant tagged or posted a single price, that was the regular price.  If no price was tagged or posted, or if the merchant posted one price for credit and another for cash, the regular price was whatever was charged to credit card users.  *Id.*  In 1984, Congress allowed the ban on surcharges to expire, although the provision prohibiting card issuers from contractually barring discounts for cash remained.  *Id.*  With the lapse of the federal surcharge ban, several states (including New York and Kansas) adopted the operative language of the federal ban. *Id.* Finally, the Court noted credit card companies have included provisions in their contracts prohibiting merchants from imposing surcharges for credit card use, but recent antitrust challenges have raised doubts about their validity, bringing increased importance and scrutiny to legislative surcharge bans.  *Id.* at 1147-48.

dissemination of information." *Id.* at 561-62. Moreover, the Court has rejected the "'highly paternalistic' view that government has complete power to suppress or regulate commercial speech." *Id.* at 562. "[P]eople will perceive their own best interests if only they are well enough informed, and … the best means to that end is to open the channels of communication rather than to close them …." *Id.* (citation omitted.) So, "[e]ven when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all." *Id.* At the same time, there is a "commonsense distinction" between speech concerning a commercial transaction, which has been traditionally subject to governmental regulation, and other varieties of speech, such that the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 563. "The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Id.*

"The First Amendment's concern for commercial speech is based on the informational function of advertising." *Id.* (citation omitted.) As a result, there can be no constitutional objection to suppression of commercial messages that do not accurately inform the public about lawful activity." *Id.* But "[i]f the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed." *Id.* at 564. "The State must assert a substantial interest to be achieved by restrictions on commercial speech" and "[t]he limitation on expression must be designed carefully to achieve the State's goal." *Id.* This means the restriction "must directly advance the state interest involved" and "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." *Id.*

The *Central Hudson* test is an "intermediate standard of review" in which the court must ask: (1) whether the State's interests in proscribing the commercial speech are substantial; (2) whether the challenged regulation advances those interests in a direct and material way; and (3) whether the extent of the restriction on protected speech is in reasonable proportion to the interests served. *Aptive Envtl., LLC v. Town of Castle Rock, Colo.*, 959 F.3d 961, 987 (10th Cir. 2020) (quoting *Edenfield v. Fane,* 507 U.S. 761, 767 (1993)).

The parties agree for purposes of summary judgment that Plaintiff's purported speech concerning differential pricing is truthful and not misleading and that the *Central Hudson* framework governs Plaintiff's claim.  (Doc. 16 at 14; Doc. 17 at 3.)  The court accordingly applies that test.  *Cf. Expressions Hair Design,* 137 S. Ct. at 1151 (concluding that surcharge ban regulated commercial speech and remanding for consideration under *Central Hudson*).

### C.  **Application of *Central Hudson* to K.S.A. 16a-2-403**

Defendant argues K.S.A. 16a-2-403 furthers the following substantial state interests: it encourages businesses to charge lower prices by allowing cash discounts; it lowers the amount of consumer credit card debt by encouraging the use of cash discounts; and it provides benefits to merchants by encouraging cash purchases and thereby allows them to receive immediate payment, avoid credit card fees, and incur lower costs.  (Doc. 17 at 4-6.)  Defendant argues the law "directly advances" the state's interests in the aforementioned ways, and also because it "prevents a fundamental unfairness of the consumer always having to bear the brunt of the cost of doing business."  (*Id.* at 6.)

Defendant's first argument is that the law furthers a substantial state interest by encouraging businesses to charge lower prices to cash-paying customers.  (Doc. 17 at 4.)  As an initial matter, Defendant does not explain why Kansas has a substantial interest in encouraging

lower prices only for cash-paying customers, nor does Defendant cite any uncontroverted facts or evidence to support the assertion.  In this context, "[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it."  *Aptive Envntl, LLC,* 959 F.3d at 988 (quoting *Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60, 71 n. 20 (1983)).  Moreover, "[u]nlike rational-basis review, the *Central Hudson* standard does not permit [the court] to supplant the precise interests put forward by the State with other suppositions."  *Id.* (quoting *Edenfield,* 507 U.S. at 768).  Defendant has not met its burden of showing a substantial state interest in lowering prices for cash-paying customers.  *Cf. Rowell v. Paxton,* 336 F.Supp.3d 724, 731 (W.D. Tex. 2018) ("the State has failed to provide any basis other than a generalized interest in consumer protection, which the court concludes is too abstract to provide an appropriate benchmark.")

Even had such an interest been shown, Defendant has not shown that the Kansas law advances that interest in a direct and material way and in reasonable proportion to the interest. Barring Plaintiff from displaying its proposed price and cost information does not directly advance an interest in lowering for-cash purchase prices.  No evidence is cited to show that Plaintiff's proposed manner of displaying a single price and making clear that credit card purchases entail an additional charge above the regular price would discourage people from making cash purchases. *See id.* ("there is no actual, empirical evidence before the court of harm to consumers or commerce, past or present, in restricting the merchants in this action from communicating to their customers that they will charge a surcharge for a credit-card purchase in an amount not to exceed the swipe fee charged the merchant.")  *Cf. Edenfield,* 507 U.S. at 771 (burden is on the government to show that "the harms it cites are real and that its restriction will in fact alleviate them to a material degree.")  According to the uncontroverted facts, the Kansas law may cause merchants to avoid giving cash "discounts" altogether and instead adopt single-price models that spread merchant

credit card costs among all purchasers, thereby increasing prices for cash customers. Plaintiff's desire to display a single price while informing customers that credit card purchasers will be charged an additional fee would logically tend to support whatever interest the state may have in encouraging lower prices for cash customers. K.S.A. 16a-2-403 nevertheless effectively prohibits this type of disclosure. Clearly, this restriction on speech is more extensive than necessary to further the asserted state interest. *Cf. Central Hudson,* 447 U.S. at 564 ("if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.")

Defendant's second asserted state interest is that by "encouraging the use of cash, the Act lowers the amount of credit card debt for consumers." Doc. 17 at 4. Preventing an overuse of consumer credit card debt could conceivably be a valid State interest – excessive consumer debt could obviously have detrimental effects – but it is difficult to see how K.S.A. 16a-2-403 advances that interest. Defendant cites the law's authorization of cash discounts, but the same incentive to use cash to obtain a product at a lower cost is present under Plaintiff's proposed manner of describing the higher cost of a credit card purchase as an additional charge above the item's price. By focusing on the allowance of cash "discounts" and ignoring the fact that the price differential between cash and credit purchases is the same even with the statute's speech restriction, Defendant inadvertently makes the point that the speech restriction serves no real purpose. Limiting how Plaintiff can describe the price differential has no obvious bearing on the economic incentive to save money by using cash instead of credit. Either way, the incentive is the same. *Cf. Edenfield,* 507 U.S. at 770 ("the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.") Defendant has failed to show that the restriction on speech advances the asserted interest or is in reasonable proportion to it.

Defendant next argues the statute benefits merchants by encouraging immediate cash payments and thereby reduces merchants' credit card costs.  (Doc. 17 at 5-6.)  This argument suffers from the same defect described above.  Even assuming Kansas has some substantial interest in aiding merchants by encouraging cash rather than credit purchases, Defendant cites no evidence to show that the restriction on speech imposed by K.S.A. 16a-2-403 directly and materially advances that interest.  Again, the economic incentive for a customer to make a cash purchase is the same regardless of whether the lower price is called a discount or the higher price is characterized as a surcharge resulting from a credit card fee.  Defendant does not explain how the speech restriction in K.S.A. 16a-2-403 encourages cash purchases, nor does he cite evidence that it in fact does so.  Defendant has thus failed to show that the restriction on protected speech advances or is in reasonable proportion to a substantial state interest.

Lastly, Defendant argues the Kansas statute furthers a state interest in preventing the "fundamental unfairness of the consumer always having to bear the brunt of the cost of doing business." (Doc. 17 at 6.)  Defendant cites legislative history from the debate over the 1981 federal TILA surcharge ban, in which a congressional representative complained that a credit card holder should not be "charged twice" for use of the card – apparently referring to finance charges imposed by the card issuer for its extension of credit and a surcharge by the merchant for use of the card to make a purchase.  (*Id.*)  This argument fails to show that the restriction on commercial speech resulting from K.S.A. 16a-2-403 directly advances the asserted interest.  For purposes of summary judgment, it is uncontroverted that "[w]hen businesses are unable to pass on the cost of a credit card acceptance as a surcharge, that cost is often built into the costs of all goods and services sold by that business, which in turn raises prices for all customers regardless of whether they use credit or non-credit payment options."  (Doc. 16 at 11.)  In effect, then, K.S.A. 16a-2-403 does not

18

prevent consumers from bearing "the brunt of the cost of doing business."  At most it results in merchants spreading the cost of using credit cards among all purchasers, cash and credit, thereby somewhat reducing the cost to credit card users but shifting those costs to cash purchasers.  It does so, moreover, by preventing Plaintiff and others from giving customers an accurate and full disclosure of the costs associated with credit card purchases.  *See Italian Colors Restaurant v. Becerra,* 878 F.3d 1165, 1177 (9th Cir. 2018) ("But the higher cost is a result of credit card fees, and referring to the price differential as a discount prevents retailers from accurately conveying that causal relationship [between credit card usage and costs].")  It might also be pointed out that the "fundamental unfairness" argument loses credibility when Kansas has carved out wholesale exemptions to the law for state and county entities. *See* K.S.A. 72-1176; 19-122; 75-30,100 ("A state agency may impose an additional fee to recover the actual amount of any cost incurred by reason of the method of payment used by the payee."). *See also Italian Colors Restaurant,* 878 F.3d at 1177 ("Even if there were evidence of … harm to the free market, the statute's broad swath of exemptions would undermine any ameliorative effect.")  At any rate, the Kansas statute in fact allows a merchant to pass along its credit card costs to credit card users by charging cash purchasers a discounted lower price – so long as it uses the "correct" terminology – thereby undermining Defendant's argument that the speech restriction in K.S.A. 16a-2-403 somehow furthers an interest in consumers not having to bear the merchant's costs from credit card usage.

After examining all of the arguments in the briefs, the court must conclude that the speech restrictions arising from K.S.A. 16a-2-403, as applied to Plaintiff, do not advance substantial state interests in a direct and material way and in proportion to those interests, such that it improperly infringes on Plaintiff's right of free speech.  Ultimately, Defendant has the unenviable task of attempting to justify a speech restriction that rests on little more than the State's preferred manner

of describing economic transactions.  As aptly stated by Judge Tjoflat in *Dana's R.R. Supply v. Atty. Gen., Fla.,* 807 F.3d 1235, 1239 (11th Cir. 2015), "surcharges and discounts are nothing more than two sides of the same coin; a surcharge is simply a 'negative' discount, and a discount is a 'negative' surcharge."  It is comparable to permitting a restauranteur to serve "half-full" beverages but not "half-empty" beverages.  *Id.* at 1245.  Kansas prefers to label the lower price attendant to cash purchases a "discount" and so prohibits Plaintiff from labeling the higher price of credit purchases as a surcharge, even though both describe the same state of affairs: cash purchasers pay less and credit card purchasers pay more because of the cost associated with using credit cards.  Again, as Judge Tjoflat pointed out, such a law does not ban surcharges; it merely targets expression and could be called a "surcharges-are-fine-just-don't-call-them-that-law." *Id.* at 1245.  This elevation of form over substance, which fails to directly and materially advance any substantial state interest, unjustifiably infringes on Plaintiff's right to convey information to consumers in a way that truthfully and accurately describes the transaction and allows consumers to make an informed choice.  "The First Amendment prevents staking citizens' liberty on such distinctions in search of a difference." *Id.*

On a case within its jurisdiction, and upon the filing of an appropriate pleading, the court may declare the rights of an interested party seeking such a declaration.  28 U.S.C. § 2201(a). Based on the uncontroverted facts, Plaintiff has shown that K.S.A. 16a-2-403, as interpreted in Kansas and as applied to Plaintiff, violates Plaintiff's rights under the First Amendment.  The court concludes Plaintiff is entitled to a declaratory judgment to that effect.

The only relief requested by Plaintiff in the complaint is a declaration by the court that K.S.A. 16a-2-403 is unconstitutional as applied to Plaintiff.  (*See* Doc. at 1, 16.)  Plaintiff's motion for summary judgment, however, also requests that the court "permanently enjoin the Attorney

General (and any other person acting in the name of the State of Kansas) from enforcing the no-surcharge statute against CardX."  (Doc. 15 at 1; Doc. 16 at 7, 26.)  For the reasons that follow, the court declines to issue the requested injunctive relief.

The Supreme Court has recognized that "'ordinarily … the practical effect of (injunctive and declaratory) relief will be virtually identical," except that prior to final judgment there is no declaratory remedy comparable to a preliminary injunction.  *Doran v. Salem Inn, Inc,* 422 U.S. 922, 931 (1975).  Thus, "[a]t the conclusion of a successful federal challenge to a state statute or local ordinance, a district court can generally protect [the] interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary."  *Id.* In *Wooley v. Maynard*, 430 U.S. 705, 711 (1977), the Court cited *Doran* with approval but noted that some circumstances make injunctive relief appropriate, although "[t]o justify such interference [with enforcement of state criminal laws] there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights."  (citing *Spielman Motor Co. v. Dodge,* 295 U.S. 89, 95 (1935)).  In *Wooley* the Court found exceptional circumstances where "three successive prosecutions were undertaken against [the plaintiff] in the span of five weeks," which evinced a "threat of repeated prosecutions in the future" that was "quite different from a claim for federal equitable relief when a prosecution is threatened for the first time." *Id.* at 712.  In the instant case, Plaintiff offers no evidence or argument showing that it faces a substantial likelihood of future enforcement actions notwithstanding a judgment from this court declaring that enforcement of K.S.A. 16a-2-403 would violate Plaintiff's First Amendment rights.  Because Plaintiff has not shown that a declaratory judgment would be inadequate to protect Plaintiff from future harm, the court denies Plaintiff's request for a permanent injunction.

### D. Vagueness

Plaintiff's complaint also alleges that K.S.A. 16a-2-403 is unconstitutionally vague because the "'virtually incomprehensible distinction between what a vendor can and cannot tell its customers' offends the Due Process Clause of the Fourteenth Amendment…." (Doc. 1 at 15.)

The court rejects this argument for the same reasons indicated by the Supreme Court in *Expressions Hair Design.*  In that case, the plaintiff wanted to use a "single-sticker regime, listing one price and a separate surcharge amount," but the no-surcharge statute at issue prohibited it from doing so. *Expressions Hair Design,* 137 S. Ct. at 1151.  The Supreme Court rejected a vagueness challenge to the statute because "a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim." *Id.* at 1151-52 (quoting *Holder v. Humanitarian Law Project,* 561 U.S. 1, 20 (2010)).  Just as in that case, Plaintiff seeks to use a single-sticker pricing model and acknowledges that its model is "squarely prohibited by the current Kansas law." (Doc. 1 at 5.) Under these circumstances – and notwithstanding Plaintiff's assertion that there is some uncertainty concerning the extent of the Kansas statute – Plaintiff cannot succeed on its vagueness challenge. *See id.* ("Although the merchants argue that 'no one can seem to put a finger on just how far the law sweeps,' … it is at least clear that [the statute] proscribes their intended speech. Accordingly, the law is not vague as applied to them.")

### V. Conclusion

Plaintiff's motion for summary judgment (Doc. 15) and Defendant's motion for summary judgment (Doc. 17) are each GRANTED IN PART AND DENIED IN PART.  Plaintiff's motion is GRANTED with respect to its First Amendment claim and DENIED with respect to its challenge

based on vagueness.  Conversely, Defendant's cross-motion for summary judgment is DENIED as to Plaintiff's First Amendment claim and GRANTED as to Plaintiff's vagueness challenge.

The court determines that Plaintiff is entitled to a judgment in its favor on its first claim for relief declaring that K.S.A. 16a-2-403, as applied to Plaintiff to prohibit it from selling and using its software that employs a "single-sticker" price display (including the display of a price and a percentage or dollar amount fee added onto the price for credit card purchases), violates Plaintiff's First Amendment right to freedom of speech.  Plaintiff's second claim for relief, asserting a vagueness challenge, is dismissed.  The court will enter judgment accordingly.

IT IS SO ORDERED this 25th day of February, 2021.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE